May it please the Court, John Elwood for Appellant. Agility performed the difficult and dangerous job of supporting U.S. military and reconstruction efforts in an active war zone. Now, years after receiving the benefit of Agility Services, the United States is trying to avoid fair payment by saying that the U.S. contracting officers who disbursed U.S. funds in implementing these task orders were actually acting as Iraqi agents. But the United States wasn't part of the contract, was it? It was, I don't think the Court actually has to decide that. The CPA signed or it was issued the umbrella contract. But our principal submission is that the task order is consistent with Coe's Professional, that each of the new task orders are new contracts. And those contracts were overwhelmingly issued in the names of U.S. Army entities, the Project and Contracting Officer, the Joint Contracting Command. And not only were they issued in their names, they said payment will be provided by a U.S. Army finance office in Tennessee. So I mean, everything about the... So on your original point, though, I can't find it quite here, but wasn't there a provision in the contract that said that this supersedes task orders and so forth, that the task orders come within the umbrella and those were superseded? It says, to the extent that they're inconsistent, that the umbrella contract governs. But to begin with, in December of 2004, the United States, in its own name, the Projects and Contracting Office, amended the umbrella contract to explicitly remove that limitation that it was DFI-funded contracts. And we say that that is an amendment to that contract. But I guess what we're trying to figure out is, we know that these United States contracting officers were serving as contracting officers on behalf of the interim Iraqi government. And so now your argument is, somewhere along the way, these contracting officers blurred the lines to such a degree, significant degree, that they were now, they began to serve in their standard role as contracting officers for the United States government. Is that... Their appointment papers actually appointed them to act in behalf of the United States government in implementing this task, I'm sorry, the umbrella contract. Right, but I think we have to take it as a launching point given for purposes of this appeal, that it was very clear under the umbrella contract that the United States was not going to be liable for anything under the umbrella contract. And so what you need now to convince us of is that the task orders themselves somehow established and created separate new contracts that really are not governed by the umbrella contract. Well, a couple of things. First of all, the umbrella contract itself was amended to allow expenditure of DFI funds, and that was done in the name of the Projects and Contracting But, you know, in addition to that is the fact that it was treated as a government contract essentially at every point. At the point the task orders are signed, they are signed in the name of the government. And that is a sign that they are making it for purposes of the Contract Disputes Act. Throughout the course of the agreement, they are acting as though they are principals, and that they are making modifications and amendments that they don't have the authority to do under the delegation from Iraq throughout. Well, wasn't it then the contractor's obligation to alert the other side if the task orders were going outside the scope of the contract? No, I don't think so. In page 657, the same page of the umbrella contract that says that the umbrella contract controls over any task orders to the extent there is a contract. But, also, I think one thing that is very important is the waiver of liability from the United States is a provision under a section of the contract that says, contract provisions applicable to seized, invested Iraqi property or development fund of Iraq. And beginning with Task Order 3, we are not talking about those contracts, those task orders. We are talking about ones that were funded with U.S. funds that, by its own terms, that waiver doesn't apply to. At page JA666, in bold all-cap letters, in bold-face type, it says, those are contract provisions applicable to DFI funds. These task orders are not DFI funds. And Judge Lord was on the panel for Agility Project, a public warehousing company, versus Mattis in April of this year, where this court held that, you know, it ceases to govern. When you say it ceases to govern, what is it? The limitation on liability that's in the umbrella contract for DFI contracts ceased to govern when the United States amended the umbrella contract to make it possible to spend DFI funds. And I think that that is inconsistent with the idea that the United States wouldn't be liable when it amends the contract to spend U.S. funds. And when it starts signing contracts in its own name that say payment will be provided by a U.S. Army finance group in Tennessee, I don't think that that's consistent with the idea that the United States will be liable. Who amended the contract? The contract was amended by the Projects and Contracting Office, which is a U.S. Army group, in December of 2004. And that is, of course, after it had already issued a couple of DFI-funded contracts,  And from that point forward, it was imminent. The problem is we can't tell really or we can't be sure when actions are taking place to issue orders and things like this, whether even if it's coming out of an office that's related to the U.S. military, whether it's the United States that's now having taken over the contract and taken over amending the contract and issuing task orders versus the United States in this peculiar context serving as basically an agent and a contracting officer for the Iraqi government. I disagree because remember the umbrella contract wasn't signed as PCO, as agent for the Coalition Provision Authority. It was signed, it was issued by the Coalition Provision Authority. So if it were going to behave as it did in the umbrella contract, it would have said interim Iraqi government by PCO or something like that. Instead, it just issued it in the name of the actual Army office. Can I just walk you back a little because I missed something in this debate you were having with Judge Chan. There's a provision that says that the U.S. isn't going to be liable to the contractor for any performances. What is your position about what effect that has, that that was obviated, that that was not part of what you were doing in the task orders? How do you get around that? That is at page JA671. A few pages earlier, JA666, it says, and this is under that, it says contract provisions applicable to vested and seized Iraqi property and development fund of Iraq. And so by its own terms, that provision doesn't apply to U.S.-funded contracts. That's our principal position. But secondly, even if it did for some reason, when the United States government in its own name as Projects and Contracting Office amended the umbrella contract in December of 2004 and said, now we can spend U.S. funds under this, and they started spending U.S. funds under U.S. task orders, that that is inconsistent with the idea that there's going to be a waiver of U.S. liability. When it starts signing contracts in its own name that say payment will be provided by a U.S. Army finance center in Tennessee, that is inconsistent, just as in Agility v. Mattis, a provision that's still in the contract saying you can't store things on Agility trucks, that when the government later caps payments at 29 days, that that is inconsistent with the idea that you can't store stuff on trucks during that time. Wasn't there something in some original memo or authorization that said that sources of funds could include U.S. funds, not just DFI funds? And then ultimately, you're right, that there was a memo that ultimately issued later that expanded the ability to draw not only from DFI funds but also from U.S. funds. There was a, the coalition changed, it eliminated a thing limiting it to what is defined as Iraqi funds, but Iraqi funds were defined as development fund for Iraq funds. When it expanded that, what it essentially did is it said it's public funds. So I'm just trying to remember the record. Am I misremembering that there was something originally in a memo or authorization that said that U.S. funds could potentially be used? Of course, for this umbrella contract, you are right, it talked about using DFI funds, but then I thought there was something before that that suggested there were, there was a possibility of using U.S. funds. Am I wrong? I'm not sure if I know what you're talking about because. Well, I mean, my recollection is that at least there was an amendment in December of 2004 which specifically allowed use of U.S. funds. Am I wrong about that? No, and that was made not by the interim Iraqi government, but by the projects and contracting office. The United States government did that amendment in its own name. It wasn't allowed under the delegation from Iraq. You can see that at page 373. It wasn't allowed to make amendments. Instead, it amended it in its own name and said you can use U.S. funds now. So they were, but they were amending the contract. They amended the umbrella contract, that's correct. And then each of the task orders issued under it are consistent with COAST Professional. They are, it's an established rule that new task orders are new contracts. And task orders 6 and 11 through 20. When you say established rule that new task orders are new contracts, but again, didn't we start by talking about a provision that says that everything, at least inconsistent, everything's going to be governed by the provisions of the contract? But there are no further inconsistencies once the umbrella contract is amended to allow the expenditure of U.S. funds. At that point, the inconsistency is done away with. Isn't there a question of your right to appeal to the board? Isn't there some relevant provision here that says you have to be subject to Iraqi law? There is not. Not subject to the CDA, but not even appealable to the board. No, there is. Order 100 said that going forward, laws and regulations would provide it would be subject to Iraqi law. That did not mention existing contracts. And indeed, if you look at page JA660, there's a reference to a defense FAR that itself says it's subject to American law and subject to the Contract Disputes Act. The disputes clause here itself references a FAR clause that says it's subject to the Contract Disputes Act. And so no, the contract itself specifies that at a minimum this will go to the Board of Contract Appeals. So no, we don't think that there is anything that takes us away from that. And on top of all of that, as I say, you have the government issuing in its own name these task orders, Task Orders 6 and 11 through 20. 15 through 20 were all issued after the delegation from Iraq expired completely. I don't know how that's supposed to be done as a delegation. Doesn't the contract say this contract is not subject to the CDA? It says that in a provision that, again, applies only to development fund for Iraq contracts. That's there in black and white, all bold letters, all capital letters on page JA666. And it says it's not subject to the CDA there. But there's no reason to believe that would apply when the government starts in its own name. Again, this is the Projects and Contracting Office, a U.S. Army entity. Another question I have is, is it necessarily so that if these contracting officers were operating outside the scope of the umbrella contract, does that necessarily translate to those contracting officers having created a binding contract with the United States versus the possibility that they're just operating outside of the original contract, period? Well, I think if you look at it- There's a lacuna is what I'm wondering. Well, I don't think that there is a lacuna in that they are doing this in the name of the government. They're doing things they're not supposed to be able to do, which is spend non-DFI money. They're doing it after the delegation expires completely. 15 through 20 were all issued after the delegation expired completely. And they're doing things they don't have authority to do, which is make amendments and expand the total value of the contract. I mean, Task Order 3 alone was increased by $180 million, and by two years it was extended. This isn't a footfall that one contracting officer would do. And you have 26 contracting officers who did all the contracts here. And basically, there's two ways to look at this case. Either it is, as we say, and this is contracting officers doing what they do all day, every day, day in and day out. Or it is a group of 26 contracting officers who are historically bad agents, who are literally exceeding virtually every limitation that is placed on the modest delegation of authority by Iraq. And I think that between the two of them, there's really only one explanation, which is that they were acting as principals, just like their appointment paper said. That's 877 to 878. And at 793, you have an internal government document that says, this agility is a primary contractor, a prime contractor, to the United States of America on the umbrella contract. So your point is, even in the act, and I don't want to use the word rogue agents, but even if they exceeded their authority, then let's accept that and say, so what are the consequences of that? And your answer is, if you exceeded your authority, that makes you a party to the contract. No, no, there's two ways. I think that it's first that it's not plausible that they were acting as that kind of rogue agents without anybody saying a word about it for numerous years, including afterwards. And again, remember, when they issued this, it wasn't a rogue agent. Rock Woodstock wasn't acting as a rogue agent when he defendantized the contracts and said, you owe the United States, not the Iraqi government. Well, let's assume they acted outside of the scope of their authority. Then what is the consequence? The consequence is that they're liable to agility as for violating the implied warranty that they were acting within the scope of their agency. It's covered in our brief, but I mean, when they're saying, we can do this, and they don't have authority to actually act as that, they become liable as agents. And if I could, I'd like to reserve my time for rebuttal. Thank you. Good morning, Your Honors. Excuse me. May it please the Court. Your Honor, yes, this is certainly a peculiar context that we have here for this case. And there are not two ways to look at this case. As we say in our brief, there are three ways to look at this case, certainly the two options that appellants mentioned. But the third is the plain meaning of the contract, and that is the United States officers here acted on their role as contract administrators. What about the funds question? What about the use of the U.S. funds and people signing it on behalf of the U.S.? Well, certainly that's the role of a contracting officer is to sign. I mean, contracting officers do some more stuff. Well, to be more specific, the other side is saying the umbrella contract was unambiguously limited to DFI funds. And then when all these task orders were getting pumped out where the origin of the funds were not going to be DFI funds because those were exhausted. It was going to be U.S. funds. Correct. And so now the other side is saying, aha, these are a different animal than what the umbrella contract was contemplating. So what's the answer to that? Well, Your Honor, the contract doesn't limit the source. It talks about DFI funds. It says it's going to be from DFI funds. It certainly does. And all the terms and conditions that are in the contract, which start on page 666 and run to at least page 671, those are all the terms of the contract. Everything's in there. There's the limitation of funds. There's the dispute clause, Your Honor, that mentions that this is not a CDA contract. There's the payment clause. There's the transition of authority clause. It's all in there. What appellants are now arguing is that when U.S. funds were used, when CPA and the Iraqi government chose to amend Order No. 4 through Order No. 100 because the Iraqi government did this, not the United States. This appellant says June 28, 2004, the Iraqi government changed the ability to use U.S. And this is page 400 of the record on these contracts. And later, as Your Honor mentioned, it was actually amended formally into the contract in December 2004, and the signature was by a U.S. contracting officer. But all the signatures were done by U.S. contracting officers. They were acting within their role. So you're saying there's a switch-up, and they were allowed to do U.S. funds, but that changes none of the consequences of the liability? That's correct. Because when the interim Iraqi government took over for the CPA, a successor in interest, Order No. 100 was issued. It changed a lot of the previous Order No. 4. Now, what was Order No. 4? Order No. 4 had many different things in it about contracting with the CPA. But one of the key things it has relevant for today is a block set of contract terms. These terms were cut and pasted out of Order No. 4 and pasted into this contract, into the umbrella contract. And that's where you see joint appendix page 666 all the way through, Your Honors, 671. These are terms from Order No. 4. These are terms that were amended when Order No. 100 came out. What appellants are arguing is that all these clauses disappeared from the contract when U.S. funds were used. Certainly, why these contract clauses are in the contract is irrelevant to the fact that they are in the contract. They are bound by them. The terms are here. Now, certainly they were amended by Order No. 100, but they were not removed, including the liability clause that says the United States is not liable for anything. So you're in a situation where what if the U.S. government obligating U.S. funds has never paid any U.S. funds? Does this person have any recourse? Yes. The recourse here is under Iraqi law. The dispute clause was changed by Order No. 100 to say that Iraqi law would be used for disputes. And why does that make sense? Why is this logical, Your Honors? Because at that point, the successor and interest on this contract was the interim Iraqi government. But if the U.S. was liable to pay the money, how would the U.S. not be a necessary party, even if the dispute were adjudicated under Iraqi law? Well, I think the answer to that would have to be under Iraqi law and an Iraqi court as to how the United States would be liable to Iraq for the funds that they proposed to use for such a contract. It's beyond the scope of the joint appendix we have. I don't think that kind of material is in here. Well, I guess it's confusing because the contracting officers here were authorizing the use of U.S. funds. And then so if the contractor felt like there was a breach of those task orders, you're saying they needed to go to the Iraqi government to go get money from where? From U.S. funds? Well, how the Iraqi government would pay, I'm not sure how the Iraqi government would pay through its judgment. Because they're not liable. The U.S. is liable under the contract. The Iraqi government is not liable under the contract. I'm sorry, the United States is not liable under the contract. There's the clause that you mentioned earlier, Your Honor, that says, it's on page 671, that following the transition of authority, the United States will not be liable on this contract. But if the U.S. was supposed to obligate U.S. funds for purposes of the task orders, and they failed to do that, why then would recourse be against the Iraqi government? And how would the Iraqi government be the appropriate party then to seek redress for that? Well, Your Honor, if we're talking about who the contracting party is, whoever you have contract privity is who you can sue. You can't sue a third party under the contract. They're not privity to said contract. To the extent the United States didn't provide money, which is certainly not our case, you know, we've had, we've pulled money back here, Your Honors. Then it would be a dispute between the Iraqi government and the United States as to why we promised to provide funds for one of their contracts and then did not provide them. But again, not the facts of the case we have here. Why does that make any difference? You here, so you took back the funds from another contract that was owed to compensate for what effectively you were doing, which is saying we're not going to pay you this amount under this task order. Right. And those funds, well, first off, there has been a claim filed for the monies that have been set off. So that ultimately probably will be litigated one day, Your Honor. But the United States at that point was acting still as contract administrator and, you know, checking the contract for fraud, waste, or abuse, all the things that we were responsible to do under the various clauses of the contract. And to circle back to what the contract actually says here, Your Honors. I still need a little more clarification. If the task order says you're going to get $5 million from U.S. funds. Correct. Okay. And then the United States never coughs up that $5 million. And then they want to sue for those $5 million U.S. fund dollars. Do they go to an Iraqi court to go get those U.S. funds or do they go somewhere else to get those U.S. funds? Well, two things about that. Yes, they would go to an Iraqi court. And I'm wondering why is that if the task order authorized the funds to be from the United States, not from any Iraqi source? Because of contract privity with the Iraqi government, Your Honor. You can't sue outside of the contract another party. You have to sue the party you have contract privity with. The contract has a dispute clause saying that it's governed under Iraqi law. I'm not sure if Iraqi government has its own type of judgment fund or something else that could be used in a similar situation. Iraqi law hasn't been presented in this case, as the board noted. So maybe I shouldn't be thinking of the funds like they're some res located in the United States Treasury account. It's fungible. Money is fungible, Your Honor. What is interesting about the argument that Appellant is positing is that they are ignoring the terms of the contract, that there is this precedent clause on page. And I'm blanking right now, Your Honors. I apologize. There are a lot of pages in this contract. Oh, I'm sorry. I have it right here. I made a little cheat sheet and forgot about it here, Your Honors. It is page 657 of the record. This is the method of ordering clause. What is very interesting about the Kingdomware case, about the Coast professional case, which deals with GSA federal supply schedule contracts, is that they are wholly unlike the vehicle we have here today. GSA contracts are entered into with GSA, the contractor, and then any federal agency may come along and get an order underneath them. The terms of those contracts often change. I've seen many GSA FSS procurement competitions, there's also often competitions with them, where the new federal agent is trying to get a lower price or to change something slightly in the actual order. Here, we have a method of ordering clause that says the task orders are subject to the terms and conditions of the basic contract, and that the basic contract will take precedent in the event of a conflict with any of the task orders. Here, we have a completely different situation than the GSA FSS contract. We have task orders that are bound by the umbrella contract. And as the Court of Federal Claims- I'm sorry, did you say umbrella contract? Yes, the umbrella contract, Your Honor. And then, Your Honors, recently, the Court of Federal Claims, looking at Kingdomware and Coastal Group, when there was an argument that all task orders are new contracts under Kingdomware and Coast professionals, said that that's not true. And I think the Court of Federal Claims was correct on this. They said, Kingdomware does not stand for the general proposition that all task orders are considered contracts as a matter of law. And if you look at page 1978 of Kingdomware, you see that they specifically rely on the fact that FSS contracts are not bound by the terms of the original contract award. Unlike the situation we have here today, Your Honor, where this contract specifically says on page 657 that you must look at the original terms of the contract. So what should agility have done going back in time? You know, we're in this wartime situation. There's contracting officers lighting up this umbrella contract like a Christmas tree, ordering things left and right. What should they have done to protect themselves if you feel like everything was so crystal clear? They made an attempt to protect themselves, Your Honor, and that's on page 785 of the record. There's an email sent to the contracting officer four days after the signing of the contract. This email points specifically to what is JA671, the turnover of the CPA provision, saying that successor in interest will be the interim Iraqi government. And they say, well, we're not very comfortable with this clause that we've already signed. Maybe we can have a performance bond. So they were looking for a way here to make sure that they would actually get paid. When it came down to it, they were paid, Your Honor. Now, there was some dispute over whether they were paid. Certain monies were paid too much here or too little there, but the money did come through. So four days after they signed this, they were well aware of the situation they were in. This is not a surprise that came upon them. And, of course, they are certainly not left without a recourse here. As we mentioned, the dispute clause now says that Iraqi law governs this contract and agility can go to Iraq. We should mention the correct real interest in party because we do dispute that agility LLC is the real interest in party. We believe that this court can affirm on alternative grounds there. But whoever is the real interest in party can go to Iraqi government. And the liability would lie with the Iraqi government. Correct. And any dispute over whether the United States was supposed to pay would be a dispute between the United States and Iraq. That would come subsequently to back, Your Honor. There's a litigation going on in Georgia right now. What is the status of that? The fraud litigation, Your Honor? I believe that's been settled. Okay. Yes. And that kind of specific context that we're talking about here with the fraud, Your Honor, is exactly why we feel that it is important that agility LLC does not exist, that a company that does not exist and never existed certified this claim here. If there is some sort of fraud or false statement made with this certification, there could be issues arising over the fact that agility signed the certification. But what do we do with that if we just affirm the board we don't have to go there or reach that? Well, yes. Basically, the board said the same thing in its remand decision, Your Honor, that since they already said there's no jurisdiction because of the CPA, there's no need to actually fully decide who the party with the real interest here is. But to the extent the court finds that this does fall under the CDA or there is a charter issue here, which we believe is not within this court's jurisdiction anyway, that any remand would have to involve figuring out who the real party in interest actually is before anyone can actually get a final judgment up on the board below. The December 4 amendment? Yes, 674 of the record, Your Honor. Right. The PCO, did he sign that on behalf of IIG or on behalf of the United States? Every action the United States took here was on behalf of the IIG, Your Honor. It says United States of America. Of course, Your Honor. I mean, they were acting as the contract administrators here. Things weren't carefully done. This is something that is recognized. I think there was 27 was the number of different contracting officers that was said to us. Here, the answer the United States put forth to the board mentions that a contractor officer was killed in the line of duty here. Records were destroyed. I think there was a warehouse fire destroying more records. Things weren't perfectly done here, Your Honor. But that doesn't create contractivity, nor does exceeding your authority, as Your Honor mentioned before. To the extent the court has no further questions, we respectfully request the court affirm the decision. Thank you. Thank you. May it please the court. Three minutes. Thank you. May it please the court. There's no inconsistency with task orders being issued by an entity different than the one that signs the umbrella contract. In Amoresco, the Department of Energy signed the umbrella contract, and the Department of Defense did the task orders. And in this case, the contract specifies that contracting officers can issue task orders. It doesn't say, you know, only on behalf of the Iraqi government. It says contracting officers can do it. And other places, it says the government can do that. And I think that that's a term that has to mean the United States, in part because contracting officers are defined as government employees, and every contracting officer here was a United States employee. And in addition, you know, there's some indemnity clauses that don't make any sense unless it's the United States government being indemnified because it's to indemnify for Iraqi fines and Iraq isn't going to indemnify itself. So I think that it's impossible to say that there's any inconsistency between the U.S. saying we have this umbrella contract here, maybe it's with the CPA, but we can issue individual task orders under it. And there's no inconsistency because it allows the expenditure of U.S. funds. Those contracts were made by the United States. They weren't signed as the CPA. They were signed by the Projects and Contracting Office or the Joint Contracting Command, both U.S. Army entities. They were signed saying payment will be provided by a U.S. Army finance center in Tennessee. So, again, there is no inconsistency between the two of them. I know the government says it takes the position that everything done here was done as a U.S. agent. They have to deal with the fact that that agency expired by its own terms in December of 2006, and when the government of Iraq re-upped that at page 377 of the Joint Appendix, it said, again, limited to DFI funds, and it said this is a limited number of contracts because DFI funds, of course, were spent by that point, and it says they'll all be wrapped up by 2006. But this contract was not wrapped up by the end of 2006. As I say, 15 through 20 were all issued in 2007, where the government's authority as an agent was completely gone. In 2008, they increased the total cost of 15 and 20. And in the 2009 audits, those were done for consistency with the Federal Acquisition Regulation and U.S. law. They weren't done for consistency with Iraq law, and they were done at the behest. If you look at the audit things that were requested by U.S. agencies, they were distributed only to U.S. agencies, not to Iraq. And remember, at the end, Rock Woodstock, he wasn't a rogue agent. He said, you are indebted to the United States, not you're indebted to Iraq under these contracts. And they said, pay the United States Treasury. And in addition, at the end of it, he said, you have CDA remedies. Remember, when he definitized all of these task orders, they looked perfectly like United States contracts. And there was no authority that the government had. They're saying now that they've been acting without authority since 2006. And the only explanation is, without anyone complaining, is that they were really acting as they always do with the United States as a party. Thank you. Thank you. We thank both sides, and the case is submitted.